**CPC INTERNATIONAL, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**Slip Op. 96–106.**
**Court No. 95–02–00144.**

United States Court of
International Trade.

July 8, 1996.

Neville, Peterson & Williams (John M. Peterson, George W. Thompson, and Arthur K. Purcell), for plaintiff.

Pillsbury Madison & Sutro (Lynn L. Miller and James M. Chadwick), for The Pillsbury Company, amicus curiae.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch; Jeanne E. Davidson, Assistant Director (Rhonda K. Schnare, Trial Attorney), Civil Division, U.S. Department of Justice, for defendant.

## OPINION AND ORDER OF REMAND

NEWMAN, Senior Judge:

### Introduction

This action raises a significant issue of first impression concerning the country of origin marking of goods.

CPC International, Inc. ("CPC" or "plaintiff"), a major multi-national food producer, proposes to import Canadian-origin peanut slurry[1] to be processed, together with other ingredients, in the manufacture of CPC's "Skippy" brand peanut butter. CPC requested the United States Customs Service ("Customs") to issue a preimportation ruling as to whether its finished peanut butter, containing a small amount of Canadian-origin peanut slurry, must be marked to show Canada as the country of origin pursuant to 19 U.S.C. § 1304(a).

In Headquarters Ruling Letter 557994 of October 25, 1994 ("HRL"), Customs decided the country of origin marking issue adversely to CPC's position that such marking should not be required, which ruling precipitated this action seeking preimportation judicial review.

The Pillsbury Company, another major United States food manufacturer that also imports certain food ingredients, appears in this action as *amicus curiae* in support of CPC.

Briefly, Customs applied its interim amendments to the Customs Regulations implementing the North American Free Trade Agreement Implementation Act of 1993, Pub.L. 103–182, 107 Stat. 2057–2225 (December 8, 1993), *codified at* 19 U.S.C. § 3311 *et seq. See* Executive Order No. 12889, 58 Fed.Reg. 69681 (December 27, 1993) ("NAFTA Implementation Act" or the "Act"). The Act approved and entered into force the

---

**1.** "Peanut slurry" is a gritty paste made from shelled peanuts that have been roasted, blanched, split and ground.

North American Free Trade Agreement ("NAFTA"), effective January 1, 1994. Customs ruled that under the interim regulations, CPC's retail containers of finished peanut butter, containing but a small quantity of Canadian-origin peanut slurry, do not qualify for the exception from marking under 19 C.F.R. § 134.35(b) and the referenced NAFTA Marking Rules, 19 C.F.R. § 102.20. Applying the hierarchical analysis required by 19 C.F.R. § 102.11, Customs determined in its HRL that CPC's finished product sold at retail must be marked to show it is a "product of Canada."

Plaintiff claims that Customs acted arbitrarily and contrary to law in failing to also address whether the post-importation manufacture of peanut butter from, among other ingredients, a small portion of Canadian slurry results in "substantial transformation" of the slurry under the oft-cited *United States v. Gibson–Thomsen, Co., Inc.,* 27 CCPA 267. C.A.D. 98, 1940 WL 4085 (1940) (*"Gibson–Thomsen"*), and accordingly, whether CPC would be the "ultimate purchaser" of the imported good under 19 U.S.C. § 1304(a), thereby exempting the finished peanut butter from country of origin marking. Hence, the court must determine whether the *Gibson–Thomsen* substantial transformation test of an ultimate purchaser under 19 U.S.C. § 1304(a) must, in addition to application of

the NAFTA exemptions, be considered by Customs in the country of origin marking of finished goods manufactured in the United States from NAFTA goods.

This action invokes this court's jurisdiction to grant preimportation declaratory relief concerning Customs' rulings pursuant to 28 U.S.C. § 1581(h).[2] Plaintiff moves for judgment on the agency record under CIT Rule 56.1 that the HRL and NAFTA interim regulation 19 C.F.R. § 134.35(a), which limits *Gibson–Thomsen* to articles other than goods of NAFTA countries, are arbitrary and contrary to law, and requests a remand of the ruling to Customs.

## BACKGROUND

■ On January 14, 1992, CPC requested a preimportation ruling as to whether CPC's retail containers of "Skippy" brand peanut butter, to be manufactured at its factory in Little Rock, Arkansas in small part from Canadian-origin peanut slurry, must be marked showing Canada as the country of origin pursuant to 19 U.S.C. § 1304(a), as amended. In support of its request, CPC furnished Customs with its proposed manufacturing process,[3] and relying on the holding of the appellate court in *Gibson–Thomsen,* contended that such process results in a

2. The basis of the court's exclusive jurisdiction, 28 U.S.C. § 1581(h), reads:

> (h) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, *marking*, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation. [Emphasis added.]

At the outset, defendant raised the threshold issue of jurisdiction, and moved to dismiss this action in accordance with CIT Rule 12(b)(1), claiming the court lacks jurisdiction under § 1581(h). In an opinion and order of July 24, 1995, defendant's motion to dismiss was denied. Slip Op. 95–132.

3. According to CPC, in its request for a ruling it informed Customs that CPC proposes to import Canadian-origin peanut slurry, which following

importation a small portion would be blended with slurry made from United States origin peanuts and combined with other domestic ingredients, all of which would then undergo certain manufacturing processes that cause the slurry, both imported and domestic, to acquire significant new commercial attributes in the form of the finished consumer-ready peanut butter. CPC further represented that its post-importation manufacturing operations, to be conducted at plaintiff's manufacturing facility in Little Rock, Arkansas, would result in a change of name, character and use of the slurry (*viz.,* a "substantial transformation"), which would constitute CPC as the "ultimate purchaser" of the imported slurry under 19 U.S.C. § 1304(a) and the principle of *Gibson–Thomsen.*

Defendant has neither conceded nor denied that plaintiff's manufacturing process, as described, results in "substantial transformation" under the *Gibson–Thomsen* test, which is a mixed question of fact and law that the court is not required to decide at this juncture.

"substantial transformation" of the slurry, and accordingly, exemption from marking of the finished peanut butter as CPC would be the "ultimate purchaser" of the slurry under 19 U.S.C. § 1304(a).

In *Gibson–Thomsen*, the importer challenged Customs' requirement of country of origin marking for certain hairbrushes and toothbrushes made from imported wood brush blocks and toothbrush handles that were to be combined with bristles after importation into the United States to produce finished brushes. The Appellate Court found that the finished brushes were new articles of commerce, distinct from the imported wood handles, the manufacturer of the brushes was the ultimate purchaser of the imported wood brush blocks and toothbrush handles, and therefore, the finished brushes were not subject to country of origin marking under section 1304(a):

> We find nothing in the statute nor in its legislative history to warrant a holding that the Congress intended to require that an imported article, which is to be used in the United States as a material in the manufacture of a *new article having a new name, character and use,* and which, when so used, becomes an integral part of the new article, *be so marked as to indicate to the retail purchaser of the new article that such imported article or material was produced in a foreign country. On the contrary, we are of the opinion that the Congress intended, by the provisions of Section 304(a)(2), supra, to cover only such imported articles as do not lose their identity as such when combined with other articles.*

> \*    \*    \*    \*    \*    \*

> \* \* \* We are of the opinion, therefore, that, at the time of their importation, the involved articles [the brush blocks and toothbrush handles] were marked "in such manner as to indicate to" *the "ultimate purchaser in the United States"—the manufacturer of the toothbrushes and* hairbrushes—the country of origin—Japan.

27 CCPA at 273, 1940 WL 4085 (emphasis in part in original).

The courts have consistently followed the new "name, character and use" substantial transformation test of *Gibson–Thomsen* in determining whether imported goods must be marked in accordance with 19 U.S.C. § 1304(a). *See e.g.: Uniroyal, Inc. v. United States,* 702 F.2d 1022 (Fed.Cir.1983), *aff'g* 3 CIT 220, 542 F.Supp. 1026 (1982); *National Hand Tool Corp. v. United States,* 16 CIT 308, 1992 WL 101006 (1992); *Koru North America v. United States,* 12 CIT 1120, 701 F.Supp. 229 (1988); *Superior Wire v. United States,* 11 CIT 608, 669 F.Supp. 472 (1987); *Ferrostaal Metals Corp. v. United States,* 11 CIT 470, 664 F.Supp. 535 (1987); *National Juice Products Assoc. v. United States,* 10 CIT 48, 628 F.Supp. 978 (1986); *Carlson Furniture Indus. v. United States,* 65 Cust. Ct. 474, C.D. 4126 (1970); *Midwood Indus., Inc. v. United States,* 64 Cust.Ct. 499, C.D. 2046, 313 F.Supp. 951 (1970), *appeal dismissed,* 57 CCPA 141, (1970); and *Grafton Spools, Ltd. v. United States,* 45 Cust.Ct. 16, C.D. 2190 (1960). As observed in *Tropicana Products, Inc. v. United States,* 16 CIT 155, 159, 789 F.Supp. 1154, 1157 (1992), "[s]ubstantial transformation is a concept of major importance in administering the customs and trade laws." Plaintiff insists that the seminal *Gibson–Thomsen* principle, which Customs refused to consider in its HRL, remains alive and well for NAFTA as well as non-NAFTA imports.

Under the Act, 19 U.S.C. § 3311, *et seq.,* Congress approved and entered NAFTA into force under United States law effective January 1, 1994 and the statement of administrative action proposed to implement the Agreement that was submitted to Congress on November 4, 1993.[4] Neither the Act nor the statement of administrative action suggests that there was any intent to amend 19

---

4. On December 17, 1992, the United States, Canada, and Mexico signed the North American Free Trade Agreement, a trilateral trade preference. The President concluded NAFTA under authority conferred by Congress in the Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100–418, 102 Stat. 1107–1574. *See* 19 U.S.C. § 2901. United States obligations under NAFTA were implemented in national law by the North American Free Trade Agreement Implementation Act of 1993, Pub.L. 103–182, 107 Stat. 2057–2225 (1993).

U.S.C. § 1304(a), except as discussed *infra* in connection with § 1304(a)(3)(H). The Implementation Act, 19 U.S.C. § 3314(a)(2), delegates to the appropriate officers of the United States (*i.e.*, Customs) authority to issue regulations necessary to implement the Act. Customs promulgated implementing interim amendments to its regulations, Treasury Decisions 94-1 and 94-4, discussed *infra*, effective January 1, 1994, concerning, *inter alia*, marking requirements and country of origin determinations—the NAFTA "Marking Rules."

On April 29, 1994, CPC's initial ruling request of January 14, 1992 was administratively closed at CPC's request. However, on June 21, 1994—following the NAFTA Implementation Act and promulgation of new interim amendments to the Customs Regulations—CPC by letter reiterated its request for a ruling as to whether the manufacture of peanut butter in the United States would result in a "substantial transformation" of the Canadian peanut slurry, and whether on that basis CPC would be the "ultimate purchaser" of the slurry thereby exempting the finished peanut butter from marking pursuant to 19 U.S.C. § 1304(a).

Applying the NAFTA Rules of Origin, 19 C.F.R. Part 102, Subpart B, Customs employed the "hierarchical analysis" required by 19 C.F.R. § 102.11, and the interim marking regulations, 19 C.F.R.Part 134, including § 134.35(b), which regulation excepts from country of origin marking a finished good where the processing of the imported good in the United States "would result in the [finished] good becoming a good of the United States under the NAFTA Marking Rules." *Inter alia*, Customs ruled: "[s]ince the peanut slurry that will be imported is a good of a NAFTA country (Canada) when imported into the United States, the country of origin marking requirements of the finished peanut butter *will be based on the determination of whether the processing in the United States would cause the final product to be of United States origin pursuant to the NAFTA marking rules*" (emphasis added). Continuing, Customs ruled: "the processing in the United States does not result in the peanut butter becoming a good of the United States under NAFTA Marking Rules, [and] the Section 134.35(b) exception from the marking requirement does not apply. The retail container of the finished product that reaches the ultimate purchaser must be marked to reflect Canada as the country of origin." HRL 557994 at 4.

Specifically, Customs reasoned that since the processing of the Canadian-origin peanut slurry into finished peanut butter would not result in the required change in classification or "tariff shift" under the NAFTA "Marking Rules," 19 C.F.R. §§ 102.11(a)(3) and 102.20,[5] the finished good would not be "a good of the United States"; and that the "essential character" of the finished product within the purview of § 102.11(b) is imparted by the imported and domestic peanut slurry.[6] Accordingly, based *solely* upon its hierarchical analysis under the interim regulations, including application of the Marking Rules, and without addressing whether or not CPC would be the ultimate purchaser of the Cana-

---

**5.** With respect to peanut butter, which is classified in heading 2008.11, HTSUS, the applicable interim NAFTA Marking Rule requires the following change in classification:

    2008.11 A change to subheading 2008.11 from any other chapter, provided that the change is not the result of mere blanching of nuts.

    Customs ruled that Canadian peanut slurry is classifiable under subheading 2008.11.90, HTSUS, and the finished peanut butter is classifiable under subheading 2008.11.10, HTSUS, and hence the "tariff shift" requirements for subheading 2008.11 are not met. This aspect of the HRL is not contested by plaintiff.

**6.** Customs determined that since none of the provisions of § 102.11(a) yields a country of ori-

gin determination, including a change in tariff classification under § 102.20, Customs was then required as part of the required hierarchical analysis under the Rules of Origin to invoke the provisions of § 102.11(b), which focus on the single material that imparts the "essential character" of the good to determine the country of origin. Section 102.18(b)(2) provides that only materials (domestic and foreign) that do not undergo a tariff shift are to be taken into consideration in determining the essential character of a good and that the imported and domestic peanut slurry impart the essential character of the finished peanut butter. Plaintiff does not contest Customs' determination that the peanut slurry (domestic and foreign) impart the essential character of the finished peanut butter.

dian peanut slurry under § 19 U.S.C. § 1304(a) pursuant to the substantial transformation test of *Gibson–Thomsen*, Customs ruled that CPC's retail containers of finished peanut butter containing Canadian-origin peanut slurry must be marked to show that the finished article is a "product of Canada". HRL 557994 at 4.

In failing to address the issue of substantial transformation raised by CPC, Customs ostensibly applied its interim regulation 19 C.F.R. § 134.35(a) that abolished the *Gibson–Thomsen* rule for NAFTA goods, which is essentially the gravamen of plaintiff's complaint and request for relief.

Specifically, CPC requests a judgment holding the HRL to be arbitrary and contrary to law to the extent that, after applying the hierarchical analysis referred to above and determining that plaintiff's proposed processing of the Canadian slurry into finished peanut butter does not result in the prescribed tariff shift under the Marking Rules, as required by the exception to marking under 19 C.F.R. § 134.35(b), Customs failed or refused to additionally address whether, as an independent basis for exemption from marking, CPC would be the ultimate purchaser of the peanut slurry under the *Gibson–Thomsen* substantial transformation rule.

Plaintiff also seeks a declaratory judgment that 19 C.F.R. § 134.35(a) impermissibly limits *Gibson–Thomsen* to imports from non-NAFTA countries, and is therefore arbitrary and contrary to law. Plaintiff requests that the court remand the HRL to Customs with instructions to consider whether plaintiff's post-importation processing of the Canadian peanut slurry meets the requirements of the *Gibson–Thomsen* substantial transformation factors.

*Amicus curiae,* The Pillsbury Company, has filed briefs in support of essentially the same position and contentions urged by CPC.

## DISCUSSION

### I.

The key issue is whether the Congressional approval of NAFTA under the Implementation Act, including an obligation of the Parties under NAFTA to establish rules of origin, or so-called "Marking Rules," and certain exemptions from marking specified under NAFTA Annex 311(5)(b), abrogated and replaced for NAFTA goods imported into the United States the *Gibson–Thomsen* substantial transformation test for determining who is the "ultimate purchaser" of goods under § 1304(a).

The court concludes:

(a) While Congress authorized issuance of regulations necessary to implement the Act (which approved NAFTA), including establishment of the Marking Rules, Congress did not intend that Customs abolish the long-standing *Gibson–Thomsen* substantial transformation test for the ultimate purchaser provision of § 1304(a) for NAFTA goods. Rather, Congress intended that the Appellate Court's interpretation of the ultimate purchaser provision of § 1304(a) in *Gibson–Thomsen* should remain in full force and effect as a case-specific test *in addition to and independent of* the application of the NAFTA Marking Rules and NAFTA exemptions from marking based on those rules;

(b) interim regulation § 134.35(a), purporting to abrogate the *Gibson–Thomsen* test for NAFTA goods, is contrary to Congressional intent under the NAFTA Implementation Act to preserve the long-standing substantial transformation test, while at the same time implementing the new NAFTA Marking Rules and NAFTA marking exemptions based on those rules;

(c) interim regulation § 134.35(a) is outside the scope of Customs' delegated authority under 19 U.S.C. § 3314 because the abrogation of *Gibson–Thomsen* for NAFTA goods was not only contrary to Congressional intent to preserve the test for NAFTA goods, but was unnecessary to implement the Act and new NAFTA Marking Rules or to comply with a Party's obligations under the Agreement;

(d) while recognizing Congressional approval under the Act of establishment of Marking Rules and exemptions from marking under NAFTA Annex 311, continuity following the Act of the application of *Gibson–Thomsen* as an *independent alternative* test

to application of the Marking Rules as a basis for exemption from marking avoids contravention by Customs of 19 U.S.C. § 3312(a) and 19 U.S.C. § 1304(a);

(e) based on the foregoing, the court holds that the HRL and interim regulation § 134.35(a) are arbitrary and otherwise not in accordance with law. 28 U.S.C. § 2640(d); 5 U.S.C. § 706(2)(A); *National Juice Products,* 10 CIT at 62, 628 F.Supp. at 991.

## II.

The basic statutory framework for country of origin marking, 19 U.S.C. § 1304, as amended, was unchanged by the NAFTA Implementation Act (except as indicated *infra* ). Section 1304(a) so far as relevant, provides: "Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked * * * in such manner as to indicate to an *ultimate purchaser* in the United States the English name of the country of origin of the article." (Emphasis added.)

Section 1304(a), neither prior to nor following the Act, provided a definition of "ultimate purchaser," thus leaving the specific implementation of the provision to administrative and judicial interpretation. Notwithstanding that identifying the "ultimate purchaser" of an imported good is a pivotal inquiry in the administration of country of origin marking pursuant to § 1304(a), it is not surprising that given the variable circumstances under which the term must be applied, Congress has never attempted to provide a definition of the term. It is plaintiff's position, and the court agrees, that the Act approving NAFTA made no change in the judicial definition of an ultimate purchaser under § 1304(a) in accordance with the *Gibson–Thomsen* substantial transformation test. Indeed, as stressed elsewhere in this opinion, the Implementation Act merely broadened the application of the ultimate purchaser provision under 19 U.S.C. § 1304(a)(3)(H) by amending the statute's standard of knowledge for NAFTA goods.

Illuminating the complexity of the necessary factual and legal analyses arising from the use in the statute of the term "ultimate purchaser" are the following observations by Customs:

It is not feasible to state who will be the "ultimate purchaser" in every circumstance. Broadly stated, an "ultimate purchaser" may be defined as the last person in the United States who will receive the article in the form in which it was imported. If an imported article will be used in manufacture, the manufacturer is the "ultimate purchaser." If an article is to be sold at retail in its imported form, the purchaser at retail is the "ultimate purchaser." A person who subjects an imported article to a process which results in a substantial transformation of the article, even though the process may not result in a new or different article, may be an "ultimate purchaser" in certain circumstances; but if the process is merely a minor one which leaves the identity of the imported article intact, the consumer or user of the article, who purchases it after processing, will be regarded as the "ultimate purchaser."

18 Fed.Reg. 5419 (September 9, 1953). *See also* interim regulation 19 C.F.R. § 134.1(d) (1995) setting forth various examples of who will be the ultimate purchaser, both under a substantial transformation analysis and under the tariff shift rules.

"The country of origin marking statute was intended, *inter alia,* 'to facilitate consumer purchasing decisions . . .' (citation omitted). By indicating to consumers where a product was manufactured, the statute helps informed and discriminating buyers decide either to 'buy or refuse to buy [a product] . . . if such markings should influence [their] will'." (citation omitted). *Koru North America v. United States,* 12 CIT at 1126, 701 F.Supp. at 234. *See also, United States v. Friedlaender & Co.,* 27 CCPA 297, 302, C.A.D. 104, 1940 WL 4083 (1940).

## III.

In addition to the basic statutory framework for country of origin marking under 19 U.S.C. § 1304, the NAFTA Implementation Act, *inter alia,* approved Annex 311(1) under which the NAFTA Parties were to "es-

tablish by January 1, 1994, *rules for determining whether a good is a good of a Party* ('Marking Rules') *for purposes of this Annex*" (emphasis added) and for other purposes. Further, under NAFTA Annex 311(2), the Parties could "require that *a good of another Party, as determined in accordance with the Marking Rules,* bear a country of origin marking, when imported into its territory, that indicates to the *ultimate purchaser* of that good the name of its country of origin." (Emphasis added.) However, under Annex 311(5)(b) the Parties were obligated to exempt from country of origin marking goods meeting certain conditions. Particularly pertinent to the issues in this case is the marking exemption under Annex 311(5)(b)(viii), which provides:

5. Each Party shall:

(b) exempt from a country of origin marking requirement a good of another Party that

(viii) is to undergo production in the territory of the importing Party by the importer, or on its behalf, in a manner that would result in the good becoming a good of the importing Party under the Marking Rules.

Also, in accordance with Annex 311(5)(b)(ix), each Party was obligated to exempt from marking a good of another Party that "by reason of its character, or the circumstances of its importation, the *ultimate purchaser* would reasonably know its country of origin even though it is not marked" (emphasis added). *For purposes of the Annex* **"ultimate purchaser** means the last person in the territory of an importing Party that purchases the good in the form in which it was imported; * * *."  Annex 311(11) (emphasis added). The term **"the form in which it was imported"** means the condition of the good before it has undergone one of the changes in tariff classification described in the Marking Rules. (Emphasis added.) *Id.* There is no suggestion whatever in the Agreement that in addition to the exemptions listed in Annex 311(5)(b), the Parties would be precluded from continuing their existing exemptions from marking or even from providing exemptions from marking in addition to those specified in Annex 311(5)(b).

Plaintiff does not challenge the implementation by Customs of NAFTA Marking Rules for country of origin determinations or as the basis for exceptions from marking; further, plaintiff does not contest Customs' implementation of the Marking Rules in conformance with the change in tariff classification methodology. Simply put, plaintiff argues, and the court agrees, that exemptions from marking based on the Marking Rules approved by the Implementation Act did not supplant the *Gibson–Thomsen* judicial interpretation of "ultimate purchaser" under the basic statute, § 1304(a) in accordance with the substantial transformation test, which remains intact for NAFTA goods *in addition to* the marking exemptions based on the Marking Rules.

**IV.**

While the Act itself entered NAFTA into force as part of United States law, the provisions of the Act itself as well as NAFTA's provisions for establishment of Marking Rules and exemptions from marking were implemented by interim regulations issued by Customs pursuant to 19 U.S.C. § 3314.

Specifically, in accordance with T.D. 94–4 (59 Fed.Reg. 110, Jan. 3, 1994) Customs added a new Part 102 to Title 19 of the Customs Regulations, which sets forth the Rules of Origin, or "Marking Rules," for determining whether an imported good is a good of a NAFTA Party. Section 102.11 sets forth the general rules for determining country of origin, whereas § 102.20 contains the specific change in tariff classification rules referenced in § 102.11 based on chapters of the Harmonized Tariff Schedule of the United States ("HTSUS").

Country of origin marking requirements for NAFTA goods and exceptions from marking were promulgated in T.D. 94–1 (58 Fed.Reg. 69460, December 30, 1993), and are set forth in interim amendments to various provisions of Title 19, Part 134, Customs Regulations, particularly § 134.35(a) and (b). Customs observed in T.D. 94–1 that the NAFTA Parties "in view of the different existing customs legal and procedural requirements * * * agreed to use a standards

approach whereby agreement was reached on *certain minimum principles* to be reflected in each Party's regulations * * * " (emphasis added).

The genesis of § 134.35(a) and (b), the application of which is central to the issue presented, is as follows. As early as 1953, the Secretary of the Treasury amended the Customs Regulations to administratively codify the principle of *Gibson–Thomsen* in 19 C.F.R. § 11.8(e) (1953). T.D. 53336 (Sept. 9, 1953). In 1972, Customs renumbered the regulation as § 134.35, T.D. 72–262, 37 Fed. Reg. 20321 (Sept. 29, 1972); and as indicated *infra*, at the time of issuance of the HRL, the *Gibson–Thomsen* regulation was again renumbered as 19 C.F.R. § 134.35(a) (1994).

At the time of CPC's initial request for a ruling, 19 C.F.R. § 134.35 (1993) provided:

### 134.35 Articles substantially changed by manufacture

An article used in the United States in manufacture which results in an article having a name, character, or use differing from that of the imported article, will be within the principle of the decision of the case of United States v. Gibson–Thomsen Co., Inc., 27 C.C.P.A. 267 (C.A.D. 98). Under this principle, the manufacturer or processor in the United States who converts or combines the imported article into the different article will be considered the "ultimate purchaser" of the imported article within the contemplation of Section 304(a), Tariff Act of 1930, as amended, 19 U.S.C. § 1304(a), and the article shall be excepted from marking. The outermost container of the imported article shall be marked in accord with this part.

19 C.F.R. § 134.35 (1993).

Following Congressional approval of NAFTA under the Implementation Act, the text of § 134.35 (1993), *supra*, was redesignated as subsection (a) and prefaced, "*Articles other than goods of a NAFTA country.*" The new subsection (a) under § 134.35 essentially purports to abrogate for NAFTA goods the *Gibson–Thomsen* test of an ultimate purchaser under § 1304(a). T.D. 94–1, *supra*.

Subsection (b) of § 134.35, prefaced as "*Goods of a NAFTA country,*" excepting from marking NAFTA goods to be processed in the United States which become a good of the United States pursuant to the NAFTA Marking Rules, is predicated on NAFTA Annex 311(5)(b)(viii), which similarly is based on the Marking Rules. Unlike subsection (a) which specifically mentions the ultimate purchaser provision of § 1304(a) as construed in *Gibson–Thomsen*, subsection (b) makes no reference to implementing the ultimate purchaser provision of the statute or implementing the statute in any manner, and the exception reflects only an implementation of NAFTA's Annex 311(5)(b)(viii) exemption from marking based on the Marking Rules.

Plaintiff does not dispute that 134.35(b) validly implements the exemption from marking under Annex 311(5)(b)(viii), or that its finished peanut butter does not meet the prescribed change in tariff classification pursuant to the Marking Rules, 19 C.F.R. § 102.20, for the marking exception under § 134.35(b). However, plaintiff maintains that *in addition to* addressing the hierarchical analysis required by § 102.11 and the exception from marking under 19 C.F.R. § 134.35(b) predicated on the rules of origin under § 102.20, Customs was required to *independently* consider on a case-specific basis whether plaintiff's proposed processing of the slurry in the United States would meet the *Gibson–Thomsen* substantial transformation test. Consequently, according to plaintiff, the HRL is arbitrary and contrary to law because Customs failed to consider whether, based upon the processing of the slurry in the United States into peanut butter, plaintiff would be the "ultimate purchaser" under § 1304(a) predicated on substantial transformation of the slurry. In the same vein, plaintiff challenges the validity of 19 C.F.R. § 134.35(a) on the ground that the interim regulation impermissibly precludes the application of the *Gibson–Thomsen* test to NAFTA goods.

The court must agree with plaintiff's contentions. Clearly, in implementing the Act by regulations pursuant to § 3314(a) it was neither "necessary" nor "appropriate" for Customs to abrogate the application of *Gib-*

son–Thomsen for NAFTA goods pursuant to 19 C.F.R. § 134.35(a), and therefore, in issuing that interim regulation Customs contravened the intent of Congress under the Act in approving NAFTA and exceeded Customs' delegated authority.

■ "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). *Accord, Lyng v. Payne,* 476 U.S. 926, 937, 106 S.Ct. 2333, 2340–41, 90 L.Ed.2d 921 (1986). *See also, Killip v. Office of Personnel Management,* 991 F.2d 1564, 1569 (Fed.Cir.1993). Therefore, if regulations issued by an agency are inconsistent with the statutory authority underlying them, they are invalid. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977) (Department of Defense regulations that would have operated to deny enhanced reenlistment bonuses to a certain class of reenlisting servicemen contravened Congressional purpose of underlying statute and hence were held invalid).

Fundamentally, it must be presumed that when Congress approved the NAFTA Agreement, Congress was well aware of *Gibson–Thomsen* and the long line of judicial authority and regulations codifying the "name, character or use" substantial transformation test, which had been long applied to 19 U.S.C. § 1304(a) judicially and administratively in determining whether the manufacturer or processor was the ultimate purchaser of the imported good. Significantly, however, upon Congress' approval of the Agreement under the Implementation Act, NAFTA did not obligate the United States to replace its well established *Gibson–Thomsen* substantial transformation test for an ultimate purchaser under § 1304(a), Congress did not do so under the Implementation Act, and Congress

did not intend to delegate the authority to do so to Customs.

■ The Senate Report which accompanied the NAFTA Implementation Act suggests quite the contrary, and notes that § 207(a) of that Act "authorizes, for NAFTA-origin goods, certain *additional exemptions* from the marking requirements of Section 304." S.Rep. No. 103–189, 103d Cong., 1st Sess. 23 (1993). The foregoing statement in the Senate Report is obviously not dispositive, but does suggest the continued application of *existing exemptions,* which included the ultimate purchaser provision of § 1304(a) as construed in *Gibson–Thomsen.* The court must agree with plaintiff that Congress intended that the NAFTA marking exemptions under Annex 311(5)(b) based on the Marking Rules should represent a standard minimum exemption framework to which all the NAFTA Parties were obligated to adhere, which Marking Rule exemptions when implemented and applied by Customs *in addition to* the existing substantial transformation test of an ultimate purchaser under § 1304(a) would provide NAFTA goods with an advantageous marking exemption framework over non-NAFTA goods to which, of course, the Marking Rules do not apply.

The court must also agree with *amicus'* contention, citing H.R.Rep. No. 103–361, 103rd Cong., 1st Sess., Part I at 8–9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2558–59, that the unmistakable purpose of NAFTA is to *eliminate* trade barriers, *not to create them.* Hence, NAFTA through the Implementation Act introduced into United States law new or additional exemptions from marking for NAFTA goods while continuing existing exceptions in full force and effect. Indeed, for NAFTA goods Congress expressly broadened the ultimate purchaser exception under 19 U.S.C. § 1304(a)(3)(H), pursuant to § 207(a)(4) of the Implementation Act in conformity with the exemption under Annex 311(5)(b)(ix).[7] Having thus facilitated and

7. As aptly pointed out by *amicus,* marking requirements constitute one barrier to trade that Congress specifically intended to ameliorate under the Implementation Act by expressly amending 19 U.S.C. § 1304(a)(3)(H) thus broadening the standard of knowledge respecting the "ultimate purchaser," thus adding subsection (h) to

the basic marking statute. This amendment aimed at broadening the application of the § 1304(a)(3)(H) ultimate purchaser exception from marking of NAFTA goods is the direct antithesis of any Congressional intent to abrogate for NAFTA goods the ultimate purchaser exemp-

broadened the application of the ultimate purchaser exception for NAFTA goods under § 1304(a)(3)(H), it is most unlikely that under the Implementation Act Congress intended to abolish the long-standing application of the *Gibson–Thomsen* substantial transformation test to the ultimate purchaser of NAFTA goods in conformance with § 1304(a). Accordingly, the court determines that interim regulation § 134.35(a) contravenes Congressional intent under the Implementation Act and is outside the scope of the agency's authority to issue regulations "necessary" to implement the Act.

## V.

■ Citing 19 U.S.C. § 3312(a),[8] plaintiff argues against any application to plaintiff of the NAFTA Marking Rules or exemptions from marking under Annex 311 in a manner that would eliminate the existing judicial interpretation of the ultimate purchaser provision under § 1304(a). In essence, plaintiff argues that denial of an exemption from marking based solely on consideration of the interim regulations, including the Marking Rules, would be inconsistent with § 1304(a) unless Customs gives due consideration on a case-specific basis to whether manufacture of the peanut butter in the United States results in substantial transformation of the Canadian slurry under the *Gibson–Thomsen* factors, and hence whether plaintiff is the ultimate purchaser of the slurry within the purview of § 1304(a). Such inconsistency re-

sults from the fact that unlike the tariff shift approach of the Marking Rules in the application of 19 C.F.R. § 134.35(b), "[t]o determine whether a substantial transformation of an article has occurred for purpose of ascertaining who is the 'ultimate purchaser' each case must be decided on its own particular facts," *Uniroyal, Inc.*, 3 CIT at 224, 542 F.Supp. at 1029, and must be based on the totality of the evidence. *Ferrostaal Metals*, 664 F.Supp. at 541. As observed in *Koru*, 701 F.Supp. at 234, n. 9, "[t]he plethora of tests results from the cases on substantial transformation being 'very product specific and ... often distinguishable on that basis, rather than by their statutory underpinnings.' *Courts have not adhered rigidly to a single test [to yield a substantial transformation] because of 'the importance of focusing on the facts of each case'.* * * * Courts find it 'difficult to take concepts applicable to products' such as textiles and apply them to combinations of liquids or fabrication of steel articles." (citations omitted.) (emphasis added.)[9]

Plaintiff further points up the prohibition under § 3312(a) that nothing in the Act shall be construed to amend or modify existing law of the United States, "unless specifically provided for in this Act." Significantly, when Congress under the Implementation Act intended to amend or modify § 1304, it did so expressly, as in § 207(a)(4), which by adding subsection (h) to § 1304 broadened the standard of knowledge for the ultimate purchaser

tion under § 1304(a) based on the *Gibson–Thomsen* substantial transformation test.

8. So far as pertinent, that provision of the NAFTA Implementation Act reads:

> § 3312. Relationship of the Agreement to United States and State Law
> (a) Relationship of Agreement to United States law
> (1) United States law to prevail in Conflict
> No provision of the Agreement, nor the application of any such provision to any person or circumstance, which is inconsistent with any law of the United States shall have effect.
> (2) Construction
> Nothing in this Act shall be construed—
> (A) to amend or modify any law of the United States * * * unless specifically provided for in this Act.

9. An analysis of the case law reveals that the courts have applied several tests under the rubric of "substantial transformation." Of course, the most significant is the "name, character, or use" test. *Koru North America*, 12 CIT at 1126, 701 F.Supp. at 234, citing *Anheuser–Busch Brewing Ass'n v. United States*, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1907) and *Gibson–Thomsen. Koru* notes that three other tests are manifest from caselaw: (1) the "article of commerce" test; (2) the "essence" test; and (3) the "value added" test. *See Id.* at 234, n. 9 and cases cited. It is also noteworthy that in *Gibson–Thomsen*, 27 CCPA at 273, 1940 WL 4085, the court held that substantial transformation occurs when an article acquires a "new name, character, *and* use." (emphasis added.) Even this test has long been liberalized by the courts and administratively applied more flexibly by requiring a "new name, character, *or* use." *Koru*, 12 CIT at 1126, 701 F.Supp. at 234.

under the marking exception in 19 U.S.C. § 1304(a)(3)(H). However, nothing in the Implementation Act suggests that Congress intended to amend to amend § 1304(a) for NAFTA goods by replacing the *Gibson–Thomsen* rule for determining whether the manufacturer or processor is the ultimate purchaser of the imported article. Defendant, apparently recognizing the difficulty of its position in light of the § 3312(a) constraints on the impact of the Agreement and the Act on existing law if the tariff shift methodology were applied in a manner inconsistent with the case-specific "name, character, and use" substantial transformation test of *Gibson–Thomsen*, goes to great lengths to rationalize that the tariff shift concept is *not* a replacement of the traditional substantial transformation rule, but is really nothing more than a "reflection" or "codification" of the rule.[10]

However, it is quite apparent to the court that the *Gibson–Thomsen* substantial transformation test of an ultimate purchaser under § 1304(a) is indisputedly so methodologically distinct from the change in classification format of the Marking Rules applied under § 134.35(b) as to make a mockery of the use of the term "codification." In any event, whether or not the term "codified" is the apt term to apply to the affect of the tariff shift rules on the *Gibson–Thomsen* test, Congress expressly intended under 19 U.S.C. § 3312(a) to avoid a conflicting application of NAFTA or the Act with existing United States law, except where the Act expressly amends or modifies the existing law.

Unless the potentially conflicting methodologies may coexist and traditional substantial transformation be applied to NAFTA goods in addition to and independently of the tariff shift rules, the latter may run afoul of the Act's prohibitions under 19 U.S.C. § 3312(a).

In point of fact, Customs itself has frequently had occasion to contrast traditional substantial transformation with the change in classification concept. For example, at the time Customs published the interim NAFTA Marking Rules, the agency also issued a *Notice of Proposed Rulemaking* in which it proposed to adopt the NAFTA Marking Rules under 19 C.F.R. 102 as a universal country of origin regulation, to govern origin determinations for all goods from all foreign sources. 59 Fed.Reg. 141 (Jan. 3, 1994). Customs at that time proposed amending 19 C.F.R. § 134.35 to completely eliminate the *Gibson–Thomsen* test as an exception to marking, and to instead provide that the goods would be exempt from marking only if, by reason of post-importation manufacturing or processing, they became a "good of the importing Party" pursuant to the NAFTA Marking Rules. In its proposal to adopt the NAFTA Marking Rules as a universal country of origin regimen, Customs observed:

Notwithstanding the long history of the substantial transformation rule, its administration has not been without problems. These problems devolve from the fact that application of the substantial transformation rule is on a case-by-case basis and often involves subjective judgments as to what constitutes a new and different article or as to whether processing has resulted in a new name, character and use * * * The very fact that the substantial transformation rule has been the subject of a large number of judicial and administrative determinations is testament to the basic problems: the case-by-case approach, involving application of the rule based on specific sets of facts, has led to varied case-specific interpretations of the basic rule, resulting in a lack of predictability which in turn has engendered a significant degree of uncertainty, both within Customs

---

**10.** Thus, defendant emphasizes that on May 5, 1995 Customs published in the Federal Register specific examples of the process by which judicial decisions concerning substantial transformation were taken into account in establishing the tariff shift rules. 60 Fed.Reg. 22312, 22314– · 22330 (May 5, 1995). Further, defendant stresses that the new Marking Rules are intended to "provide the results that would be reached under the case-by-case application of the substantial

transformation rule * * *." 59 Fed.Reg. 141, 142 (January 3, 1994). On the other hand, in T.D. 94–4 Customs disclosed that the tariff shift concept "was specifically developed as an *alternative to the traditional substantial transformation rule*" in order to obviate various problems in origin determinations and is *intended to eliminate* the difficulties encountered in the "case-specific" criteria imposed by substantial transformation.

and in the trade community as regards the effect that a particular type of processing should have an origin determination.

\*    \*    \*    \*    \*    \*

The change in tariff classification standard was specifically developed as an alternative to the traditional substantial transformation rule in order to obviate the problems described above. Customs believes that rules based upon the change in tariff classification approach, would provide by virtue of their greater specificity, more objectivity, transparency, and predictability in origin determinations. \* \* \*

59 Fed.Reg. 141, 142.

That traditional substantial transformation and the tariff shift rules[11] stand as separate, independent methodologies even under the Marking Rules, is pointed up by certain rules of origin under 19 C.F.R. § 102.20 wherein Customs *by administrative choice* uses a *dual approach* requiring that the prescribed tariff shift must *also* result in a substantial transformation. For purposes of such rules, "substantial transformation" is, not surprisingly, defined in 19 C.F.R. § 102.1(p) to mean "production which results in a new and different article, with a new name, character and use." Hence, under § 102.20 for certain HTSUS chapters, Customs must apply tradi-

tional substantial transformation *in addition to* specific tariff shifts.[12]

The Marking Rules' requirement that certain tariff shifts must also result in substantial transformation in the traditional sense underscores the significant distinction in the two approaches, and at the same time highlights the apparent recognition by Customs of the desirability or necessity for, in addition to the change in tariff classification concept, applying the traditional substantial transformation methodology under existing law for certain products. Surely, then, it is inconsistent with existing law and Customs' own dual tariff shift/substantial transformation approach under certain Marking Rules, as described above, for Customs to have otherwise abrogated the application of the traditional *Gibson–Thomsen* substantial transformation approach for NAFTA goods under § 134.35(a) and now assert to the court that the NAFTA rules "codify" such approach.

## VI.

Plaintiff's initial memorandum of law sought an exception from marking under the "ultimate purchaser" provision of 19 U.S.C. § 1304(a)(3)(H) and § 1304(h) based on *Gibson–Thomsen.* The Government replied, correctly, that *Gibson–Thomsen* did not construe § 1304(a)(3)(H), but rather § 1304(a), and in any event the ultimate purchaser of

---

11. In that regard, plaintiff cites examples of obvious substantial transformations of goods into new articles having a new name, character and use, that would nonetheless fail the tariff shift test, leading to absurd results. Fundamentally, statutory interpretation should avoid reaching absurd results, as presumably Congress would not have intended such results. *Amicus* also devotes a substantial portion of its memorandum of law to illustrate the internal inconsistency, disparate, arbitrary, and anomalous results reached under the Marking Rules and hierarchy set out in 19 C.F.R. § 102.11 for certain food products, other than peanut butter, resulting from the disregard of substantial transformation and reliance solely on prescribed tariff shifts. As previously noted, even when applying the traditional methodology, the courts have employed a plethora of substantial transformation formats under case-specific analyses to achieve a rational flexibility and to avoid reaching absurd results with regard to certain products. It is apparent that the rigidity of the change in classification concept of the Marking Rules, as expeditious and efficient as that approach may be for origin determinations, may produce results as anomalous

as a rigid application of the traditional "name, character, and use" test regardless of the product.

12. For example, the NAFTA Marking Rule for HTS heading 1901.90 requires: A change to subheading 1901.90 from any other heading, or; a change to a product of subheading 1901.90 from any other product within heading 1910 *if that change results in a substantial transformation.* (Emphasis added.) Additionally, Customs has prescribed certain other *tariff shifts under the Marking Rules that must constitute a traditional substantial transformation,* including HTS headings 2103.90, 4823.20 through 4823.59, 4823.70 through 4823.90, 6811.90, 6812.90, 6814.90, 7010 through 7018, 7019.90, 7020, 8708.99, 9010, 9401.90, 9403.90 and 9606.21 through 9606.29. 19 C.F.R. § 102.20.

Interestingly, Customs may have second thoughts concerning the continued use of traditional substantial transformation for its NAFTA rules of origin. *See Notice of Proposed Rulemaking,* 60 Fed.Reg. 22312 (May 5, 1995).

the slurry for purposes of § 1304(a)(3)(H) would be the retail consumer of the finished peanut butter, not CPC.

■ In its reply brief and at oral argument plaintiff withdrew its claim for an exception from marking as the ultimate purchaser under 19 U.S.C. § 1304(a)(3)(H), and instead focused the substantial transformation test under the principle of *Gibson–Thomsen* on the ultimate purchaser provision of § 1304(a). As previously indicated, under the *Gibson–Thomsen* rule, if imported materials are processed into a finished article, resulting in substantial transformation of the imported good, the finished good is exempt from country of origin marking because the manufacturer is the "ultimate purchaser" of the imported good within the purview of § 1304(a). Further, plaintiff, who proposes to manufacture peanut butter from imported slurry, makes no claim for an ultimate purchaser exception to marking under § 1304(a)(3)(H) based on whether the retail purchaser of the finished peanut butter meets the standard of knowledge under § 1304(h).

### CONCLUSION

In approving NAFTA under the Implementation Act, Congress had no intent to overrule or abrogate the *Gibson–Thomsen* substantial transformation test of an ultimate purchaser under 19 U.S.C. § 1304(a) for NAFTA goods, did not do so expressly under the Act, and did not grant Customs authority to do so by interim regulation. Customs' interim regulation § 134.35(a), purporting to abrogate the *Gibson–Thomsen* rule for NAFTA goods, contravenes Congressional intent, exceeds Customs' authority to promulgate regulations necessary to implement the Act, and therefore is arbitrary and otherwise not in accordance with law. Customs' HRL, which failed to address the *Gibson–Thomsen* substantial transformation factors in addition to the NAFTA exception and Marking Rules, is also arbitrary and contrary to law.

In view of the foregoing conclusions, the HRL is remanded to Customs for consideration of whether plaintiff would be the ultimate purchaser of the Canadian slurry under 19 U.S.C. § 1304(a) in accordance with the *Gibson–Thomsen* substantial transformation factors.

Customs shall submit the results of remand to the court and serve counsel for the respective parties within forty-five (45) days of the service of this order. Plaintiff and *amicus* may respond to the remand results within thirty (30) days of issuance; defendant may reply to such response within thirty (30) days of service.