UNITED STATES *v.* INTERNATIONAL PAINT Co., INC. (No. 4582) [1]

[1] C. A. D. 376.

United States Court of Customs and Patent Appeals, January 6, 1948

*Paul P. Rao,* Assistant Attorney General (*Sybil Phillips,* special attorney, of counsel), for the United States.
*James W. Bevans* for appellee.

[Oral argument December 3, 1947, by Miss Phillips and Mr. Bevans]

Before GARRETT, Presiding Judge, and HATFIELD, JACKSON, and O'CONNELL Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

The Government here seeks review and reversal of the judgment of the United States Customs Court, First Division, sustaining the protest of appellee against the refusal of the Collector of Customs at the port of New York to allow drawback upon certain merchandise described in the protest as "Antifouling Semi Paste Paint," exported in September 1944 under Drawback Entry No. 6888, the entry being

liquidated "No Drawback," on July 6, 1945. The claim of appellee was and is that the exported product was manufactured or produced from a substance broadly described in its brief as "certain imported paint which contained the active and essential ingredient necessary in anti-fouling paints, namely, copper or compounds of copper," and section 313 (a) of the Tariff Act of 1930 is invoked. The imported product came from England and the exported product went to Canada.

Counsel for the Government contend that "The antifouling semi-paste paint exported by appellee was neither manufactured nor produced in the United States with the use of imported merchandise." The gravamen of its contention relates to the statutory phrase "manufactured or produced."

The text of section 313 (a) of the Tariff Act of 1930 which is pertinent to the issue here involved reads as follows:

(a) * * * Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties, * * *.

It is conceded on the part of the Government that all applicable regulations relating to drawback were complied with. So, the sole question involved, as stated in the brief on behalf of the Government, is "whether the anti-fouling semipaste paint exported by appellee was manufactured or produced in the United States with the use of the imported merchandise."

The collector's action in the instant case seems to have been taken by direction of a deputy collector in charge of drawback to whom the protest had been referred, and the action of the deputy collector to have been based upon an official letter of the Commissioner of Customs, dated December 11, 1944, refusing appellant's application to establish a rate of drawback on the merchandise on the ground that a manufacture or production within the meaning of paragraph 313 (a) of the Tariff Act of 1930 did not result from what appellant did to the imported merchandise from which the exported product was made. We hereinafter quote from the commissioner's letter.

The judgment of the United States Customs Court, rendered in conformity with its decision, C. D. 1052, sustained appellant's claim for drawback and directed the collector to "reliquidate the entry accordingly."

While counsel for the Government insist that a conclusion different from that reached by the Customs Court should be drawn from the established facts they do not assign any error as to that court's statement of facts found by it, and we here reproduce the statement:

* * * The merchandise as imported consisted of paint in paste form, containing, among other things, some 77 per centum of copper and copper compounds, and, as impurities mixed with water, certain strong mineral acids as well as salts

of iron and copper. The presence of these impurities rendered the imported product unfit for use as an anti-fouling paint designed for preventing marine growth on the bottoms of steel ships, and the purpose and effect of the processes to which the imported paint was subjected in this country were to remove the impurities and make a product capable of use as an anti-fouling paint. The chief ingredients which accomplish this result are the copper and copper compounds, and it is apparent that the processing applied to the imported material here did not affect the copper and copper compounds, but only removed the impurities and incidentally changed the form of the paint from paste to semipaste form.

Some of the impurities were removed merely by opening the containers in which the paint was imported and tipping out the aqueous solution containing a portion of the impurities which floated on top of the paste. More of the impurities were still left in the paste after this was done, and in order to remove them the paste was dumped into a mechanical mixer, having paddles, and from time to time, as the aqueous solution came to the surface, the mixer was stopped and the impurities ladled off. Varnish was then added to the paste, which reduced its viscosity and released the balance of the impurities. These came to the surface in an aqueous solution during operation of the mixer and were also ladled off. The remaining material, which was the exported product and consisted of usable anti-fouling paint, was then run off into shipping containers.

Provision for drawback has been a part of the tariff system of the United States "from time immemorial," but the language of the drawback provisions in different of the legislative acts has varied from time to time with resultant differences in administrative and judicial interpretations.

The theory underlying the granting of drawback, according to our understanding, is and always has been that it would encourage the development in the United States of the making of articles for export, thus increasing our foreign commerce and aiding domestic industry and labor.

The brief on behalf of appellee before us states that the language respecting drawback of tariff acts up to that of 1913 "had been variously construed, particularly by the Treasury Department, in administering the law," and that the Attorney General of the United States on September 19, 1908 (27 Op. Attorneys General 68), in response to a request of the Secretary of the Treasury, rendered an opinion in which he stated that the word "produced" should be given effect by making it apply to articles which were not manufactured in the strict sense of the word. An excerpt from the Attorney General's opinion is hereinafter quoted. The brief further states that in the 1913 tariff act the language was changed so as to relieve the law of the uncertainty of language in previous acts and that the language so used in this respect was carried forward into the 1922 and 1930 acts.

The purpose of counsel for appellee in thus referring to the legislative history of section 313 (a) appears to be to show a broadening of the statute and it is insisted, in effect, that even if it be held that the substance which appellee exported was not "manufactured" in the sense in which that term is used in section 313 (a), *supra*, it never-

theless should be held that it was "produced" within the meaning of that term. As has been stated, counsel for the Government contend that the exported substance was neither manufactured nor produced from the imported substance.

The Customs Court held it unnecessary to consider the possible application of the term "produced" as used in the statute, because of its view that the exported product was "manufactured" within the meaning of that term as used in the statute.

We find ourselves in agreement with this view, but we deem it not amiss to say that even if the Customs Court and this court be in error as to the exported paint having been manufactured from the imported merchandise there is, in our opinion, no reasonable doubt that it was produced from it.

While, so far as we are advised, no administrative or judicial authority has endeavored specifically to define the distinction between "manufactured" and "produced" as used in section 313 (a), *supra*, we think it has generally been recognized that Congress intended a distinction and that the use of the word "produced" broadened the scope of the drawback statute.

In the opinion of the Attorney General alluded to, *supra*, the drawback provision of the 1897 tariff act, sometimes referred to as the Dingley tariff law, being the subject of discussion, it was said (at pages 78–9), the italics being quoted:

It is also worthy of consideration that in every instance but one in this entire section the words "produced," "production," and "producer" are used in connection with the words "manufactured," "manufacture," and "manufacturer." The section thus begins: "Where imported materials on which duties have been paid, are used in the manufacture of articles manufactured or *produced*, etc.; and the second proviso reads: "That the imported materials used in the manufacture or *production* of articles entitled to drawback * * * when exported shall * * * be indentified * * * the facts of the manufacture or *production* * * * shall be determined and the drawback due thereon shall be paid to the manufacturer, *producer*, or exporter, to the agent of either, or to the person to whom such manufacturer, *producer*, exporter, or agent shall, in writing, order such drawback paid."

Why this careful and repeated use of the idea of production in connection with that of manufacture? Was it intended as mere surplussage and to add nothing whatever to the meaning of the act? It can hardly be thought that such was the purpose of Congress. But if it means anything at all, it must broaden the provisions of the act and make it include cases which would not be embraced in the word "manufacture." The fourth definition of the word "produce," as given by Webster, and the only one that can be here applicable, is, "To give being and form to; to manufacture; to make." There can, therefore, be but little difference between the two words "produce" and "manufacture," as used in this provision, but under this definition the word "make" can very properly be substituted for the word "produce;" and, since the technical meaning of the first part of the word "manufacture" has long since disappeared, the word "make" has substantially the same meaning as the word "manufacture," *stripped of its strict legal interpretation;* and it is but reasonable to suppose that Congress intended that this draw-

back provision should apply to cases which might not fall within the strict and limited construction given to the word "manufacture" by the courts, and for this reason added the word "produce" or its proper derivative.

This is further indicated by the use of the single word "manufacture" in the beginning of the section, to wit: "Where imported materials * * * used in the *manufacture* of articles manufactured or produced * * * ,", etc., that is, before the drawback can be allowed, the resultant article must have been "manufactured" somewhere, but it is sufficient if it be either manufactured or *produced* (made) in the United States.

The opinion then drew attention to the fact that the drawback statute involved in the case of *Tide Water Oil Co.* v. *United States*, 171 U. S. 210 (wherein drawback was refused on certain exported boxes and box shooks) did not contain the word "produce" or "production" and said (p. 79):

* * * the decision rested upon the theory that *all* the processes of manufacture had to be carried on in the United States; and the addition of the words "produced," "production," and "producer" in the present law would indicate that a different construction in this particular was intended.

We think the difficulty, if not the impossibility, of laying down an abstract rule differentiating between "manufactured" and "produced," as those terms are used in the drawback statute must be apparent. Counsel for appellee here was counsel for appellant in the case of *Rolland Frères, Inc.* v. *United States*, 23 C. C. P. A. (Customs) 81, T. D. 47763, wherein we cited and discussed several of the cases cited here, and sought to have this court lay down such a rule.

The merchandise there involved consisted of ladies' dresses which had been imported, and after importation embroidered and exported. We found that the record showing with respect to how much embroidery was placed upon the dresses and "the effect it gave to the same" was "not very complete," and upon the factual record held, in effect, that it had not been satisfactorily proven that the exported product had been manufactured or produced within the meaning of those terms. We did not find it necessary, therefore, to attempt to differentiate between the terms, and in declining to do so we said:

, Appellant's counsel very frankly and forcefully presented his views, by brief and by oral argument, with the hope of here securing a positive and definite definition of the terms "manufactured" and "produced" which in the future would be an easily understood and easily applied rule for determining when an article exported had been processed within the meaning of the legislative provision under consideration. A careful study of the whole situation makes readily apparent the difficulties which would confront any court if it attempted to lay down a rule more definite in its terms than is found in the above referred to decisions. In order that the purpose of Congress in the enactment of the controverted provision may be carried out, we feel that it will be necessary for the custom officials to consider each case upon its merits, since it seems to us that the oft-repeated phrase to the effect that certain cases must stand on their own bottoms is applicable here.

In refusing appellee's application to establish a rate of drawback

which was the basis of the collector's action in refusing to pay draw-back, the Commissioner of Customs said:

The applicant filed a sworn statement subscribed to on October 19, 1944, in which it is set forth that antifouling paste paint was imported by it from England; that it was its intention to manufacture this imported paste paint into liquid paint for sale to the domestic trade; that its Canadian affiliate desired that this imported paste paint be processed into a semipaste form; that the imported paint was tested and found to contain certain undesirable acid ingredients; and that the acid ingredients were removed and a quantity of varnish added to improve the quality of the paint. The paint was then reduced to a semi-paste form for exportation to Canada.

The above-mentioned work would not appear to result in the manufacture of a new and different article having a distinctive name, character, or use, nor would it appear that the operation resulted in a change in the condition of the imported merchandise to constitute a production. Accordingly, as a manufacture or production, has not resulted in this case within the meaning of section 313, Tariff Act of 1930, the application for a rate of drawback is hereby denied.

We think the commissioner's view that the processing which appellee expended upon the imported substance did not result in a new and different article, within the meaning of section 313 (a), *supra*, was erroneous and, as of course, it is our opinion that counsel for appellant are not convincing in their effort to sustain the commissioner's view.

The commissioner cited no authorities but the brief for appellant apparently relies upon the definition of "manufactured" stated by this court in the case of *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, the pertinent portion of which reads:

* * * to constitute a manufacture of a thing, or a thing manufactured, it must appear that something has been produced so changed or advanced in condition from what it was before being subjected to the processing or treatment that whether of only one material or of more than one, it has attained a distinctive name, character or use, different from that originally possessed by the material or materials before being subjected to the manufacturing process.

It is true, as the Customs Court pointed out, that both the imported and exported products bore the name "paint" and that in that respect the exported product did not have a distinctive name different from that of the imported product. The fact that a product called "paint" was imported and that an exported product resulting from the processing of the imported substance was also called "paint" has been greatly emphasized by counsel for appellant, particularly in the oral argument before us, but we may not overlook the fact that, as also stated by the Customs Court, "the requirements of change of name, character, or use given in the definition are stated in the disjunctive." We do not think the fact that there has been no change of name is of material consequence here. As a matter of fact, a change of name alone would not necessarily result in a product being regarded as "manufactured or produced." Under some circumstances a change

in name would be wholly unimportant, and equally so is a lack of change in name under circumstances such as exist here.

As to "character," the Customs Court held that both the imported product and the exported product "remained the same in the sense that the active ingredients, copper and copper compounds, were not acted upon by the processing," but it added that the processing "did more than change the form of the paint * * * and conferred upon it a use, as a merchantable and usable anti-fouling paint, which it did not possess upon arrival in this country."

As we view it, the character or nature of the imported product was, in fact, changed, not by reason of any chemical or other action upon the copper or copper compounds ingredients, because there was none, but by the removal of the mineral acids and metal salts and the introduction of varnish. Furthermore, proof that there was a change in character is found in the fact that the exported product was fitted for a distinctive use for which the imported product was wholly unfit—the painting of the steel bottoms of ships.

It has been argued by counsel for appellant that as a matter of fact ship bottoms could be painted with the substance which was imported. In the sense that it might be spread on the bottoms we suppose that is true, but inasmuch as, according to the evidence in the case, it would virtually ruin the bottoms, its use for that purpose would not be a very intelligent act.

It should be said, we think, that, so far as the record shows, the imported substance could be safely used upon other than steel-bottomed ships, but as to the latter it is destructive unless the mineral acids be removed.

The mineral acids and metal salts referred to were described by appellee's witness (the only person testifying in the case), who stated that he was appellee's chief chemist, as "an aqua solution of sulphuric and hydrochloric acids and a certain amount of salts and salts of iron and copper."

In the decision of the Customs Court those ingredients are several times referred to as "impurities," and it was argued by counsel for appellant that appellee merely cleansed the substance, "ridding it of its impurities," and that this was not a manufacturing operation under cases cited, including the *Ishimitsu* case, *supra*. So far as the record discloses, the acids and salts may be good for paint used on some types of ships and would not be "impurities," but for the purposes of this case we assume they were impurities, and we think it sufficient to say that, in our opinion, if an operation performs the function of fitting a substance for a use for which otherwise it is wholly unfitted, it falls within the letter and the spirit of the term "manufactured" as used in section 313 (a), *supra*, and that this is

not contrary to but rather in harmony with the *Ishimitsu* case, *supra*, and other cases cited by appellant.

It will not be overlooked, of course, that the operation in this case did not consist merely in tilting the containers and pouring off the acids and salts but the use of a mechanical contrivance was necessary. Just how complex the operation was does not appear, but we do not think that is important under all the facts here appearing.

Counsel for appellant have cited a number of cases bearing upon the question of manufacture, including *Hartranft* v. *Wiegmann*, 121 U. S. 609, involving the classification of certain shells which had been cleaned, ground and polished; *United States* v. *United States Rubber Co.*, 31 C. C. P. A. (Customs) 174, C. A. D. 269, respecting the removal of dirt and other impurities from crude gutta-percha; *Anheuser-Busch Brewing Association* v. *The United States*, 207 U. S. 556, involving the question of drawback on corks used in the bottling of beer which was exported, and *Ishimitsu* v. *United States, supra.* Also counsel cited particularly on the question of "production" the cases of *Klepper* v. *Carter*, 286 Fed. 370, and *Rolland Frères, Inc.* v. *United States, supra.*

We have examined the cases so cited. Many of them are quite familiar having been often cited in previous cases involving the question of drawback. No one of them is deemed to be directly in point here.

Appellant seems to rely most strongly upon the comparatively recent decision of this court in the case of *United States* v. *Samuel Dunkel & Co., Inc.*, 33 C. C. P. A. (Customs) 60, C. A. D. 317, in which a majority of the court (Bland, J., and O'Connell, J., dissenting) sustained the collector's action in refusing to refund as drawback 99 per centum of the duties collected upon certain butter imported from Argentina in blocks of 56 pounds each, encased in boxes, and exported to a foreign country after treatment described in our decision as follows:

* * * it was forced through a die and emerged therefrom in the form of rolls weighing four pounds each, which were then cut into four equal parts, and placed, with parchment paper on the ends, in cylindrical tins. The tins were then sealed and ready for shipment. * * * A certain amount of moisture is lost in forcing the butter through the die, but such loss is inconsequential. The record discloses that the butter [known in the trade as "print butter," seemingly because of its unit size or weight] was packed in tins particularly for export, because of the substantial nature of the container, which obviously would afford greater protection for the butter while in transit.

Obviously, a comparison of the work done with respect to the butter there involved and that done with respect to the paint here involved is sufficient to disclose that that case furnishes no pertinent precedent here. The imported butter was changed in form but not in name or in character or in use. Nothing but butter was imported

and nothing but butter was exported. Nothing was taken from it and nothing added to it.

In the instant case appellant in order to fit a paint substance for a particular use eliminated certain ingredients—mineral acids and metallic salts—and introduced another ingredient—varnish.

We find no error in the decision of the Customs Court and its judgment is *affirmed.*