**CPC INTERNATIONAL, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. 97–97.
Court No. 95–02–00144.

United States Court of
International Trade.

July 14, 1997.

Neville, Peterson & Williams (John M. Peterson, New York City, George W. Thompson, and Arthur K. Purcell, Miami, FL), for plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch; Jeffrey M. Telep, Civil Division, U.S. Department of Justice; Sandra Gethers and David Cohen, Washington, DC, Office of Regulations and Rulings, United States Customs Service, for defendant.

## OPINION AND ORDER AFFIRMING REMAND RULING

NEWMAN, Senior Judge.

### I.

#### Introduction

This case involves a challenge by plaintiff, pursuant to the court's jurisdiction under 19 U.S.C. § 1581(h), to a United States Customs Service ("Customs") preimportation ruling. Customs Headquarters Ruling Letter 557994, dated October 24, 1994 ("HRL"), ruled adversely to CPC's claimed exemption from country of origin marking of CPC's "Skippy" brand peanut butter, which product would contain a blend of Canadian-origin, as well as domestic, peanut slurry among other ingredients.

In its HRL denying exemption from marking, Customs invoked solely the Marking Rules (19 C.F.R. Part 102) and other interim amendments to the Customs Regulations implementing the North American Free Trade Agreement Implementation Act of 1993,

Pub.L. 103–182, 107 Stat.2057–2225 (December 8, 1993), *codified at* 19 U.S.C. § 3311 *et seq.* *See* Executive Order No. 12889, 58 Fed.Reg. 69681 (Dec. 27, 1993) ("the NAFTA Implementation Act"). The NAFTA Implementation Act approved and entered into force the North American Free Trade Agreement ("NAFTA"), effective January 1, 1994. Specifically, Customs ruled that under the interim regulations, CPC's retail containers of "Skippy" peanut butter do not qualify for the exception from marking under 19 C.F.R. § 134.35(b) and the referenced NAFTA Marking Rules, 19 C.F.R. § 102.20. Applying the hierarchical analysis required by 19 C.F.R. § 102.11, Customs determined in its HRL that CPC's finished product sold at retail must be marked to disclose the Canadian-origin peanut slurry content of the product.

Customs' ruling, however, failed to also address the long-standing exception to country of origin marking claimed by plaintiff under the "ultimate purchaser" provision of 19 U.S.C. § 1304(a) and 19 C.F.R. § 134.35(a)(1985). Specifically, the issue raised by plaintiff was whether it could be deemed to be the "ultimate purchaser" of the Canadian-origin peanut slurry by applying the traditional change of name, character, or use test of substantial transformation as articulated in the oft-cited *United States v. Gibson–Thomsen Co.*, 27 C.C.P.A. 267, C.A.D. 98, 1940 WL 4085 (1940) (*"Gibson–*

*Thomsen"*), which issue was not addressed in the HRL.

In an opinion and order of July 8, 1996, this court agreed with plaintiff that Customs' HRL was contrary to law in that, in addition to the exemptions under the hierarchical analysis and Marking Rules prescribed for NAFTA goods under Customs' Interim Regulations, Customs was, notwithstanding NAFTA Interim Regulation 19 C.F.R. § 134.35(a),[1] required to determine whether CPC's finished peanut butter would be exempted from country of origin marking under the *Gibson–Thomsen* substantial transformation test of an ultimate purchaser under 19 U.S.C. § 1304(a). Consequently, the ruling was remanded to Customs. *CPC International, Inc. v. United States*, 933 F.Supp. 1093 (CIT July 8, 1996), *rehearing denied*, 956 F.Supp. 1014 (CIT Jan. 6, 1997).[2] Customs was instructed to determine on remand "whether plaintiff would be the ultimate purchaser of Canadian-origin slurry under 19 U.S.C. § 1304(a) in accordance with the *Gibson–Thomsen* substantial transformation factors." *Id.*, 933 F.Supp. at 1106.

In compliance with this court's remand order, Customs has, based upon the facts of record, considered the issues raised under the ultimate purchaser provision in § 1304(a) and issued its Remand Ruling, Customs Headquarters Ruling 559965, dated January 24, 1997 ("Remand Ruling"). The parties have submitted briefs in response to the new

---

1. 19 C.F.R. § 134.35(a), which limits the application of *Gibson–Thomsen* to articles other than goods of NAFTA countries, was ruled to be invalid in the prior decisions in this case. It should be pointed out that, contrary to defendant's assertion, the court did not invalidate 19 C.F.R. § 134.35(a) on the ground that the North American Free Trade Agreement ("NAFTA") Marking Rules (19 C.F.R. Part 102) are applicable to NAFTA imports (which is not disputed by plaintiff). Rather, and as plainly articulated in the prior opinions in this case, the invalidity of the contested § 134.35(a) rests on the ground that under the regulation the ultimate purchaser provision under 19 U.S.C. § 1304(a), as interpreted in *Gibson–Thomsen*, was made inapplicable to NAFTA goods, in contravention of the NAFTA Implementation's Act express prohibition of implied amendments or modifications of existing law. *See* NAFTA Implementation Act, 19 U.S.C. § 3312(a). Accordingly, there is no dispute as to

the validity of the NAFTA Marking Rules or their application to plaintiff's finished peanut butter in determining whether the finished product is a good of the United States for purposes of the exemption from marking under 19 C.F.R. § 134.35(b). Nonetheless, in addition to the NAFTA Marking Rules, *under existing statutory and case law* on the effective date of the NAFTA Implementation Act the "ultimate purchaser" provision under § 1304(a), construed in accordance with the substantial transformation test articulated in *Gibson–Thomsen*, remains a viable case specific basis for exemption from country of origin marking of NAFTA goods.

2. The administrative background of the HRL and issues addressed by Customs and this court are set forth in the two prior opinions cited above and a reading of those opinions is assumed herein.

ruling.[3]

Citing the *Gibson–Thomsen* factors and following the substantial transformation analysis of *National Juice Products Association v. United States*, 10 CIT 48, 628 F.Supp. 978 (1986), Customs determined in its Remand Ruling that, contrary to plaintiff's contention, plaintiff would not be the ultimate purchaser of the Canadian-origin peanut slurry because the slurry would not become "a new and different article having a new name, character or use" when mixed with U.S. origin peanut slurry and other ingredients to produce "Skippy" brand peanut butter. Thus, the Remand Ruling states:

> Peanut slurry imported from Canada and processed into peanut butter in the U.S. in the manner described * * * will not result in the substantial transformation of the imported peanut slurry. Accordingly, the retail consumer is deemed to be the ultimate purchaser of the imported article pursuant to 19 U.S.C. 1304, and the retail container of the peanut butter must be marked to indicate its Canadian content. The Customs Service has no objection to the marking also identifying the U.S. content, but that is a matter within the jurisdiction of the [Federal Trade Commission].

Remand Ruling at 9.

Plaintiff maintains that the Remand Ruling is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law. Briefly, the thrust of plaintiff's position is that "[u]nrefuted evidence on the administrative record before Customs indicates not only that the imported slurry loses its separate identity by being blended after importation with a far greater quantity of domestic slurry, but also that the combined mass undergoes chemical reactions which work significant and irreversible changes in its physical and chemical structure." Thus, insists plaintiff, "[t]he finished peanut butter has a different name, character and use than the imported slurry used as a minor ingredient in its manufacture." Pltf's Br. at 2–3.

## II.

### *Facts of Record*

Customs, as it must, based its Remand Ruling regarding the substantial transforma-

tion issue substantially on the facts presented by plaintiff to Customs as part of the administrative record of a preimportation ruling:

> CPC will import shelled peanuts from an unspecified country into Canada where they will be roasted, blanched, split, and . ground up in a primary mill into a "gritty paste" also known as a slurry. The slurry will be imported into the United States in tank wagons. You state that the imported slurry will not be commercially suitable for sale as "peanut butter" since it lacks the smooth and creamy character and flavor which consumers typically associate with peanut butter. You also note that the imported slurry has a very short shelf life. Subsequent to importation, the slurry is removed from the tank truck, placed into a holding kettle, and heated to a temperature of approximately 120–150 degrees Fahrenheit. The slurry is then mixed to achieve uniform dispersion of the oils. This is done because the solid materials may separate during transit. At this stage, you describe the slurry as coarse, gritty, oily, and bland.

> Next, the slurry is mixed with a ground slurry prepared from shelled United States-origin peanuts which have been roasted, blanched, split, and subjected to a primary grind in the United States. The slurries are then pumped together into a surge kettle and mixed together. According to your estimates, the ratio of Canadian-origin slurry will generally account for between 10 and 40 percent of the entire mixture. The mixed slurry is then sent to an ingredient station.

> At this station, additives are injected into the slurry mixture in a trough and the materials are then pumped into a mixing kettle where the slurry is heated to between 150 and 165 degrees Fahrenheit and mixed thoroughly. You state that the added ingredients are extremely important in determining the final taste and character of the peanut butter. These ingredients

---

**3.** Counsel for *amici* did not submit additional briefing in response to the Remand Ruling.

include salt, sweeteners (dextrose and sucrose), peanut oil, and stabilizers (a blend of rapeseed, cottonseed, and soybean oils) which are designed to react with the slurries to produce chemical changes in the finished product. In certain instances, specialty flavorings may also be added.

The product is then pumped through heat exchanqers to cool the mixture down in preparation for milling. The liquid is then pumped through two successive size reduction mills which further break up the peanut particles. Following these grinding operations, the product is no longer gritty, but is of a smooth consistency. The smooth peanut butter mixture is pumped to a vacuum kettle removing the remaining air in the product. Once this degassing is accomplished, the product is cooled to a temperature of 92 degrees Fahrenheit. This cooling triggers the formation of fat crystal structures which gives the product the smooth consistency typical of commercially available peanut butter products. You state that the formation of these fat crystals is the essential characteristic of a peanut butter as compared to a peanut slurry. While the peanut butter is still soft, the peanut butter is pumped into retail jars, sealed, and stored in a warehouse for at least 24 hours to permit further cooling and to allow the product's texture to solidify. After this processing, the product will have a long shelf life (in excess of 12 months).

In addition to the foregoing facts submitted by plaintiff, apparently relying on facts within the realm of common knowledge, Customs observed in its remand ruling that prepackaged peanuts that are roasted, blanched, split and ground into a paste (*viz.*, peanut slurry) are commercially marketed at retail as "old fashioned peanut butter" or "natural peanut butter."

## III.

### Standard of Review

■ As was the standard of review for the initial HRL, in reviewing Customs' Remand Ruling the focus of the court's inquiry is to determine whether the ruling is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 28 U.S.C. §§ 1581(h) and 2640(e); 5 U.S.C. § 706.

## IV.

### Discussion

In accordance with the court's order of remand, Customs addressed the following issue: "Whether the peanut slurry imported from Canada for processing into peanut butter in the United States, through the addition of U.S.-origin slurry as well as salt, sweeteners, and stabilizers, is substantially transformed in the United States resulting in the U.S. processor becoming the ultimate purchaser of the imported slurry pursuant to 19 U.S.C. 1304(a) and 19 C.F.R. 134.35(a)." [4]

Customs ruled on remand that *National Juice* presented an analogous situation and applied that analysis to plaintiff's domestic processing. In *National Juice,* foreign and domestic batches of frozen orange juice concentrate were blended into a manufacturing concentrate in certain foreign-domestic ratios, to which was added water, orange essences, orange oil, and in some cases, fresh juice, to produce the finished retail products (frozen concentrated orange juice or reconstituted pasteurized juice). With respect to the *National Juice* retail orange juice products, Customs had ruled that no substantial transformation resulted from such domestic processing. HRL 728557 published as C.S.D. 85–47, 19 Cust. Bull. No. 39 at 21 (Sept. 4, 1985). Citing *United States v. Murray,* 621 F.2d 1163, 1170 (1st Cir.1980) and *Uniroyal, Inc. v. United States,* 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd,* 702 F.2d 1022 (Fed.Cir. 1983), and following the traditional *Gibson–Thomsen* substantial transformation criteria of change of name, character or use, the *National Juice* court sustained Customs' ruling holding that a party claiming that processing results in a substantial transformation must "demonstrate that the processing done in the United States substantially in-

---

4. Part 134, Customs Regulations (19 C.F.R. Part 134) implements the country of origin marking requirements and exceptions of 19 U.S.C. § 1304.

creases the value of the product or transforms the import so that it is no longer the essence of the final product." *Id.,* 10 CIT at 60, 628 F.Supp. at 990.

In its Remand Ruling in the current case, Customs applied the very same "essence" analysis of *National Juice* to CPC's proposed processing of Canadian-origin peanut slurry blended with domestic peanut slurry to which other ingredients were to be added in the domestic processing ing to enhance flavor, smoothness, shelf life, etc. Hence, in the Remand Ruling Customs concluded:

> Analogously, it is reasonable to conclude that the blending together of peanut slurry of U.S. and Canadian origin along with other minor ingredients does not result in the substantial transformation of these materials. As was the case for the orange juice concentrate and juice products, the essential character of the finished peanut butter is imparted by the peanut slurry which is of both Canadian and domestic origin.

Remand Ruling at 6.

■ The court finds there is a rational—indeed compelling—basis for Customs' application of the *National Juice* "essence" analysis to CPC's processing of Canadian-origin peanut slurry; therefore, the Remand Ruling is not arbitrary, capricious, an abuse of discretion or otherwise contrary to law, as claimed by plaintiff.

Plaintiff argues that Customs' Remand Ruling arbitrarily disregards the relatively minor value of the *Canadian-origin* slurry in relation to the cost of producing the finished retail product. However, the court notes that under its "essence" analysis, the *National Juice* court rejected plaintiff's claim of

substantial transformation of the imported manufacturing concentrate in part because the manufacturing concentrate *blend* constituted the majority of the value of the end products and the evidence failed to establish any substantial increase in value from the *manufacturing concentrate stage* to the retail product stage resulting from the addition and blending of the orange essences, orange oil, and water with the concentrate and related processing in producing the retail products. Thus, the court observed: "[c]onsidering the process as a whole, the court concludes that Customs could rationally determine that the major part of the end product, when measured by cost, value, or quantity, is manufacturing concentrate [viz., the blend of both foreign and domestic concentrates] and that the processing in the United States is a minor manufacturing process." *Id.* at 991.[5]

As in *National Juice,* the court finds here that the value of the slurry blend, both Canadian and domestic, constitutes the majority of the value of the finished product, and the value of the slurry blend is not substantially increased by the additional ingredients and domestic processing. Moreover, the *National Juice* court focussed on the fact that the essential character of the retail orange juice products was in substantial part imparted by the foreign concentrate, and that the addition of other ingredients to and processing of the *concentrate* to produce the retail products "does not change the fundamental character of the product, it is still essentially the product of the juice or oranges." Thus, the court stated:

> [T]he retail product in this case [frozen concentrate or reconstituted pasteurized

---

5. Plaintiff seems to place heavy emphasis on the fact that Canadian-origin slurry alone would account for a minor portion of all the ingredients used in making finished peanut butter, and in considering the value added by U.S. processing the court should include not only the cost of the additional ingredients and U.S. processing, but also the cost or value of the U.S. peanut slurry blended with the foreign slurry. Pltf's Br. at 16. The court notes, however, that under the *National Juice* essence analysis under which the manufacturing concentrate blend (not simply the imported concentrate) imparted the essence to the retail products, the court considered only the value added to the *blend* of foreign and domestic manufacturing concentrates by the addition of other ingredients and U.S. processing of the blend. Thus, the court observed that "the major part of the end product * * * is *manufacturing concentrate* and that the processing in the United States [of the blend] is a minor manufacturing process." The foregoing analysis follows from the *National Juice* court's finding that the manufacturing concentrate blend (i.e., the blend of foreign and domestic concentrates) and not simply the imported concentrate imparts the essential character to the end products.

juice] is essentially the juice concentrate derived in *substantial part* from foreign grown, harvested and processed oranges. The addition of water, orange essences and oils to the concentrate, while making it suitable for retail sale *does not change the fundamental character of the product,* it is still essentially the product of the juice or oranges.

*National Juice,* 10 CIT at 61, 628 F.Supp. at 991 (emphasis added).

In *National Juice,* the foreign manufacturing concentrate was commonly blended with domestic concentrate in foreign-domestic ratios of 50/50 or 30/70. Hence, the blended manufacturing concentrate in *National Juice* used to produce the end retail products was derived from at least half to nearly three-fourths domestic concentrate. Here, Canadian-origin slurry blended with domestic-origin slurry would account for at least 10% and as much as 40% of the blend of slurries used in the retail product. Remand Ruling at 3. Moreover, the retail product in this case, CPC's finished peanut butter, is essentially peanut slurry (albeit enhanced in flavor, smoothness and shelf life by the domestic processing), which would be comprised in *substantial part* from the Canadian-origin slurry. The added ingredients to the blend of slurries to enhance the taste, smoothness, shelf life, etc., like the addition of water, orange essences and oils to orange juice manufacturing concentrate,[6] do not change the fundamental character of peanut slurry, or indeed change the critical fact that the

essential character of the end product is imparted by the slurry.

On the substantial transformation issue of "change of character" of the slurry blend by U.S. processing, counsel for CPC has ably marshalled the facts of record relating to the addition of various ingredients to the blend (flavor enhancers, such as salt, dextrose, sucrose, various oils), "flavor chemistry reactions," enhancement of the shelf life of the slurry, appearance, taste, palatability, and smoothness differences (more creamy and spreadable) and other identifiable physical distinctions between the slurry blend and CPC's finished peanut butter. While defendant seeks to analogize the facts of the current case to the processing of the manufacturing concentrate in *National Juice,* plaintiff attempts to analogize its U.S. processing of peanut slurry to the processing of certain fish in *Koru North America v. United States,* 12 CIT 1120, 701 F.Supp. 229 (1988).

In *Koru,* fish that had undergone initial processing in New Zealand (beheading, detailing, eviscerating and freezing) and were subsequently shipped to South Korea for further processing (thawing, skinning, deboning, trimming to remove jagged edges, fat lines and impurities, glazing to preserve moisture content and enhance shelf life, refreezing to protect the fish from spoiling and finally packaging as frozen fish fillets) were held "substantially transformed" products of South Korea. In holding that the subject fish, which had undergone initial processing in New Zealand, were substantially trans-

---

6. The foreign manufacturing concentrate import in *National Juice* was a viscous substance with a high brix level (percentage of soluble solids—sugar—in the concentrate, as measured in air at 20 degrees centigrade and adjusted for the acid correction of the solids) of 65 degrees. Because the oils and flavoring ingredients were lost during the initial process of concentrating the juice to approximately fourteen percent of its original volume, imported manufacturing concentrate lacked the characteristic flavor of oranges. By contrast, the end products after U.S. processing—either frozen concentrated orange juice or reconstituted orange juice—resulting from blending the manufacturing concentrate with other ingredients (water, orange essences, orange oil, and in some cases fresh juice) had substantially lower brix levels (the frozen product had a brix level of 41.8 degrees; reconstituted orange juice

had a brix level of 11.8 degrees) and more palatable taste chemistries. Moreover, the reconstituted orange juice product was pasteurized chilled, and packed in liquid form. *See National Juice,* 628 F.Supp. at 987. Plainly, then, the imported manufacturing concentrate and the products sold at retail after U.S. processing had vastly different physical characteristics and flavor chemistries; indeed, given the high brix value and loss of oils and flavor ingredients in producing the manufacturing concentrate, the latter, without physically and chemically changing the manufacturing concentrate, the latter could not have been marketed at retail as an acceptable ready to use consumer product. Nonetheless, the *National Juice* court upheld Customs' ruling there was no substantial transformation applying the essential character test. *Id.* at 991.

formed in South Korea, the court noted the very substantial physical changes resulting from the processing in South Korea—*indeed after processing [in South Korea] the fish no longer possessed even the essential shape of a fish.*

Defendant argues, and the court agrees, that regarding change of character, the South Korean processing of the beheaded and eviscerated fish into trimmed, deskinned, deboned frozen fish fillets would be analogous to a processing of peanuts into slurry, concededly a substantial transformation of the peanuts, but not simply the processing of slurry into finished peanut butter.[7] The latter processing is clearly more analogous to the processing of the blended foreign-domestic manufacturing concentrates into the retail orange juice products in *National Juice* than to the processing of beheaded and eviscerated fish into frozen fish fillets in *Koru.*[8]

In *National Juice,* there are no specific discussion regarding the taste chemistry involved in the flavor enhancement of the manufacturing concentrates by the addition of orange essences, orange oils, and fresh juice to produce the retail products. Plainly, without the substantial reduction in brix values and flavor enhancement of the manufacturing concentrate blend by domestic processing, the unprocessed manufacturing concentrate blend could not have been offered for sale to the retail purchaser as a palatable ready to use consumer product. Notwithstanding the significant domestic processing required to convert the manufacturing concentrate

blends into ready to use consumer products, the *National Juice* court agreed with Customs' ruling there was no substantial transformation of the foreign concentrate since notwithstanding the United States processing, the essential character of the retail products was imparted by the manufacturing concentrate blend.

In the current case, notwithstanding the differences marshalled by plaintiff between peanut slurry and plaintiff's finished retail peanut butter, produced by the addition of various ingredients (salts, sweeteners, peanut oil, and stabilizers), Customs could rationally find that the milling of the peanut slurry, and the heating and cooling, which counsel has indicated affect the taste and consistency of its finished peanut butter, do not change the very essence of the product—"the imported slurry is essentially peanut butter, and used as such, but in a less processed state than the creamy products available under well known trade names." HRL at 6, 8.

Additionally, with respect to whether the essential character of CPC's finished peanut butter is imparted by peanut slurry, Customs observed, and the court may take judicial notice of, the well-known fact that peanut slurry (i.e., prepackaged peanuts that are roasted, blanched, split and ground into a paste) is commercially marketed at retail as "old fashioned peanut butter" or "natural peanut butter."[9] Such peanut butter is also used by the consumer as a spread, albeit a less processed alternative to the more traditional peanut butter product that CPC offers

---

7. Customs has ruled that under the change in name, character or use test, a substantial transformation occurs when peanuts are manufactured into peanut butter, HRL 555062 of February 23, 1990.

8. While in its Remand Ruling at 7 Customs alludes to "refinement" of the peanut slurry, the court finds from the administrative record that CPC's U.S. processes "refine" the slurry only in the sense of enhancing the flavor, texture, etc. of the slurry blend, and not in the sense of purification or distillation of slurry. However, Customs' rulings relating to the refinement or purification of crude substances are apposite to the extent they illustrate that under an "essence" analysis, despite the significant physical and chemical changes imparted to a crude product incident to its refinement or purification, Customs has ruled there is no substantial transformation where the

essential character of the crude substances were not altered.

9. As noted by plaintiff, "[t]he administrative record does note that products similar to the imported product are sometimes marketed as *"old fashioned* peanut butter," AR–3, at 9, n. 9, and the Remand Ruling states that similar products are sometimes referred to as *"natural* peanut butter."" Pltf's Br. at 8 (emphasis in original). However, it is now well settled that a change in name is arguably the weakest evidence of a substantial transformation. *See National Juice Products,* 10 CIT at 48, 628 F.Supp. at 978, citing *Uniroyal, Inc. v. United States,* 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd,* 702 F.2d 1022 (Fed. Cir.1983) and *United States v. International Paint Co.,* 35 C.C.P.A. 87, 93–94, C.A.D. 376, 1948 WL 5030 (1948).

under its Skippy trade name. Customs properly considered, and this court takes judicial notice on the basis of common knowledge that slurry is sold as "natural" or "old fashioned" peanut butter. As observed by Customs, peanut slurry looks like "peanut butter" (admittedly more gritty than the popular smooth and creamy nationally known brands), and has the "peanutty" taste of CPC's more finished peanut butter product. Remand Ruling at 8.[10] The court does not agree with plaintiff that the flavor and appearance of the peanut slurry is "lost" in the essential character of plaintiff's retail product due to the domestic processing.

CPC argues that the "essential character" rationale applied in *National Juice* and again applied in the Remand Ruling is a "faulty analysis" of Section 304(a), fails to reflect the traditional criteria of the *Gibson–Thomsen* test, and therefore, should now be rejected by this court. Specifically, CPC contends that the "essence" analysis disregards the relatively small volume of imported slurry to be used in producing the finished product and the loss of a separate physical identity of the foreign ingredient.

As previously mentioned, in producing its finished peanut butter CPC would blend the Canadian-origin slurry with domestic slurry in foreign/domestic ratios of between 10% and 40%. Remand Ruling at 3. Plaintiff strenuously contends that at the 10%–40% ratio, coupled with "intimate" commingling of the Canadian and domestic slurries, the Canadian material would lose its separate identity and "becomes an integral part of the new article" within the meaning of *Gibson–Thomsen* indicative of a "change in character."

Pltf's Br. at 11. Thus, plaintiff points up that once blended with the U.S. slurry, the Canadian-origin slurry would no longer be physically, chemically or volumetrically distinguishable from the U.S. slurry.

While the blending or commingling of the foreign and domestic slurries obviously obfuscates the separate physical identities of the imported and domestic slurries, such blending and loss of separate identification of the foreign and domestic slurries do not, of course, change the character of either the foreign or domestic slurry, and notwithstanding further processing, the blend of peanut slurries imparts the essential character to plaintiff's finished peanut butter. Accordingly, under the *National Juice* "essence" analysis since the slurry would impart the essential character to the finished product, blending of foreign and domestic ingredients and further processing of the blend would not result in substantial transformation of the foreign product. As noted *supra*, while in *National Juice*, the domestic concentrate comprised fifty or seventy percent of the blended manufacturing concentrate processed in the U.S., the court nonetheless found no substantial transformation for purposes of country of origin marking where the essential character of the retail orange juice products was imparted by the manufacturing concentrate. *See National Juice*, 628 F.Supp. at 991, n. 20. Under the "essence" rationale of *National Juice*, no substantial transformation of the foreign concentrate resulted despite the loss of a *separate* physical identity of such concentrate in the retail orange juice products.[11] No different conclusion is warranted

10. The administrative record contains no evidence of taste tests or a flavor analysis of either the slurry or finished peanut product. The flavor of *peanut* butter obviously reflects its description as a peanut based product; given the fact that the slurry is nothing more than shelled peanuts, roasted, blanched, split, and ground up into a gritty paste, notwithstanding the absence of evidence of taste tests, Customs' finding that peanut slurry has the appearance of peanut butter and also has a "peanutty" taste is not arbitrary or capricious—indeed cannot seriously be disputed.

11. In *National Juice*, the foreign manufacturing concentrate was commonly blended with domestic concentrate in ratios of 50/50 or 30/70 (for-

eign-domestic), the blended concentrate was combined with water, essences, oils, and fresh juice and then frozen or pasteurized. Notwithstanding the foregoing blending and processing, no substantial transformation of the imported concentrate resulted since the manufacturing concentrate (both foreign and domestic) imparted the essential character to the finished retail products. *National Juice*, 628 F.Supp. at 989. The decision of the court that Customs' ruling was not arbitrary, capricious or otherwise contrary to law was expressly limited to concentrates in the ratios presented. *Id.* at 991, n. 20. Of course, no particular substantial transformation analysis applies to all products, and no methodology should be applied to a particular

here where the foreign-domestic ratios in the blends fall into the range of from ten to forty percent.

*Coastal States Marketing, Inc. v. United States,* 10 CIT 613, 646 F.Supp. 255 (1986), *aff'd,* 818 F.2d 860 (Fed.Cir.1987), although involving the issue of substantial transformation for purposes of country of exportation determination and therefore not dispositive here, exemplifies the permissible application of the essence rationale to the issue of substantial transformation in the context of blending products allegedly resulting in a new product having a new name, character and use. In *Coastal States Marketing, Inc.,* the court held the process of blending gas oil from the Soviet Union with Italian fuel oil in Italy to make fuel oil did not substantially transform the Russian oil into a product of Italy. The factual basis of plaintiff's argument there was a substantial transformation of the Russian oil was that the mixture of the two oils resulted in producing a fuel oil having qualities distinct from hose of the original Russian gas oil. Although the blended oils had a specific gravity, sulphur content, flash point, pour point, and viscosity distinct from either the Russian gas oil or the Italian fuel oil comprising the mixture, had a new use (commercial and industrial heating), a new name, and there were other distinctions between the mixture and the individual oils, the court ruled that "[d]espite the differences in the products and the qualification of the Russian oil as a grade different from the blend, the essential character of the Russian component as a fuel oil used primarily for heating remained unchanged." *Id.,* 10 CIT at 617, 646 F.Supp. at 259.

Although in the instant case, in addition to the blending of the Canadian and domestic peanut slurries, there would be additional ingredients and processing of the blend to produce plaintiff's finished peanut butter, following *National Juice* the application of the essence analysis to the finished product remains the same: there is no substantial transformation if, despite the additional ingredients and processing, the slurry imparts the essential character to the finished product.

■ In sum, plaintiff's contention that the essence rationale as applied in *National Juice* thwarts the application of the traditional "name, character and use" test of *Gibson–Thomsen* is without merit. Rather, the court finds that the essence test is embraced by and aids in applying the traditional change of name, character or use test. Moreover, in *National Juice* the court expressly cited *Gibson–Thomsen* and pointed out Customs' application of the "name, character or use" test. *National Juice,* 628 F.Supp. at 988, n. 14 and 989. Further, in *Ferrostaal Metals Corp. v. United States,* 11 CIT 470, 664 F.Supp. 535 (1987), the court observed: "In *National Juice Products* ... the Court specifically applied the criteria of name, character and use in determining that orange juice manufacturing concentrate is not substantially transformed in the process that converts the concentrate into frozen concentrated, or reconstituted, orange juice. Although the Court used the word 'essence' in describing the character of the merchandise, the focus of the court's analysis was the traditional character criterion ..." *Id.* at 473. *See also National Hand Tool Corp. v. United States,* 16 CIT 308, 1992 WL 101006, *aff'd,* 989 F.2d 1201 (Fed.Cir.1993).

Defendant points up that in its Remand Ruling, Customs also cited to *Coastal States Marketing* as a precedent in noting that "[s]imilarly the classification of peanut slurry is the same classification of the CPC International's finished peanut butter." Remand Ruling at 8. In that connection, Customs Remand Ruling, quoting from *Coastal States Marketing,* 10 CIT at 618, 646 F.Supp. at 259, states:

> [A]lthough a change in tariff classification is certainly not controlling, *Rolland Freres, Inc. v. United States,* 23 C.C.P.A.

product that leads to absurd results. For example, as the court has recognized, in conducting substantial transformation analyses, it is "difficult to generalize from cases involving combinations of articles to those that involve processing of a single material"; and it is "frequently diffi- cult to take concepts applicable to products such as textiles and apply them to combinations of liquids or fabrication of steel articles." *Superior Wire v. United States,* 11 CIT 608, 615, 669 F.Supp. 472, 479 (1987), *aff'd,* 867 F.2d 1409 (Fed.Cir.1989).

81, 89, T.D. 47763, 1935 WL 2227 (1935), the Court finds that the same classification treatment of the products involved in this case is some indication that the imported blend was not a new and different product. The imported components are each simply variant grades of the *same* product identified as fuel oil, with the resulting blend also identified as fuel oil. (emphasis in original *Id.* at 618, 646 F.Supp. at 259).

Remand Ruling, at 8.

Continuing, Customs concludes:

Similarly, the classification of peanut slurry is the same classification of the CPC International's finished peanut butter. Pursuant to the CIT's direction in *Coastal States*, Customs also finds that the fact that the slurry and the peanut butter are classified under the same tariff provision supports a finding that the peanut butter is not a new and different product. Similar to the fuel oil in *Coastal States*, we find that the peanut slurry and refined peanut butter can be considered "variant grade of the *same* product," *i.e.*, peanut butter.

Remand Ruling at 8.

■ Plaintiff further notes that to the extent peanut slurry may sometimes be used as "natural" peanut butter or may be referred to as "old fashioned" peanut butter, the descriptions are indicative of a change in name for slurry, and hence of a substantial transformation. In *National Juice*, plaintiffs argued, and the court rejected, that the name change from "concentrated orange juice for manufacturing" to "frozen concentrated orange juice" and "orange juice from concentrate" was indicative of substantial transformation. The court pointed out that the different nomenclatures referred to "orange juice" at different stages of production, and in any event "a change in the name of a product is the weakest evidence of a substantial transformation," citing *Uniroyal, supra,* and *United States v. International Paint Co.*, 35 C.C.P.A. 87, 93–94, C.A.D. 376, 1948 WL 5030 (1948). *See also Coastal States Marketing, Inc.*, 10 CIT at 618, 646 F.Supp. at 259 ("It is also not determinative that the Russian No. 2 oil can also be referred to as 'gas oil'.").

Similarly, the court agrees with defendant that for purposes of determining whether CPC's processing would result in substantial transformation, it is not dispositive that "peanut slurry," "natural peanut butter," or "old fashioned peanut butter" are called simply "peanut butter" by plaintiff.

Plaintiff further urges that "although the imported slurry might be capable of use as a natural peanut butter, the evidence of record indicates that it is more commonly used, [and is solely used by plaintiff] as an ingredient for further processing in the manufacture of peanut butter products in the United States." Further, insists plaintiff, the use of finished peanut butter (*i.e.*, simply as a spread) might be narrower and more specialized than the use of the imported ingredient (*i.e.*, as both a spread and as an ingredient for further processing into a more finished peanut butter) is another factor that suggests a substantial transformation has occurred. In connection with the foregoing contentions, plaintiff relies heavily on decisions wherein the courts considered whether substantial transformation resulted from post-importation processing that changed the imported article from a producer good (*i.e.*, one typically used by the producer in further manufacture) to a consumer good (*i.e.*, one typically consumed by an end user). *Midwood Indus. v. United States*, 64 Cust.Ct. 499, 313 F.Supp. 951 (Cust.Ct.1970), *appeal dismissed,* 57 C.C.P.A. 141, 1970 WL 11039 (1970) (manufacture of steel forgings into flanges and fittings). *See also Torrington Co. v. United States*, 764 F.2d 1563 (Fed.Cir.1985) (substantial transformation for purposes of GSP treatment).

The *National Juice* court rejected transformation from a producers' good to a consumers' good as a determinative criterion in marking cases, stating:

Customs also found that the fact that the imported concentrate is sold to producers whereas the retail product is sold to consumers does not constitute a sufficient change in character and use to render the concentrate substantially transformed. Plaintiffs rely on the *Midwood* decision, in which this court's predecessor, the Customs Court, emphasized this transition

from producers' goods to consumers' goods in finding that steel forgings are substantially transformed into flanges and fittings. [citation omitted.] As noted by Customs, however, *the significance of this producers' good-consumers' good transformation in marking cases is diminished in light of this court's recent decision in Uniroyal v. United States, 3 CIT 220, 542 F.Supp. 1026 (1982), aff'd, 702 F.2d 1022 (Fed.Cir.1983).* In *Uniroyal,* the imported article was a leather shoe upper to which an outersole was attached in the United States. Although the upper is not a consumers' good in that it cannot be worn as a shoe, the court found that there was no substantial transformation. *Id.* at 227, 542 F.Supp. at 1031. *Under recent precedents, the transition from producers' to consumers' goods is not determinative. Plaintiffs must demonstrate that the processing done in the United States substantially increases the value of the product or transforms the import so that it is no longer the essence of the final product.* [citations omitted.] *Id.,* 10 CIT at 60, 628 F.Supp. at 989–90 (emphasis added).

■ Accordingly, in *National Juice* the fact that the imported manufacturing concentrate was used solely as a producers' good whereas after domestic processing into the retail or end user orange juice products, the latter were consumers' goods was not determinative that the processing resulted in a substantial transformation of the manufacturing concentrate. The same result obtains here. Thus, notwithstanding the facts that CPC would use Canadian-origin slurry *solely* as an ingredient in its finished peanut butter and would not sell the slurry as a consumer peanut butter product, are not dispositive where the essential character of the finished product is imparted by the peanut slurry.

Finally, plaintiff insists that Customs' Remand Ruling completely sidesteps the issues of whether, for purposes of country of origin marking under § 1304(a), CPC's Skippy peanut butter is an "article of foreign origin" and whether Customs may lawfully require "ingredient disclosure" of the Canadian slurry in the finished product. The court disagrees.

Fundamentally, a determination of the country of origin for purposes of the marking statute is a mixed question of fact and law. As to the latter aspect of the question, the courts have employed various criteria, the principle of substantial transformation being of paramount application. *See National Juice,* 628 F.Supp. at 988–89, n. 14; *Coastal States Marketing, Inc.,* 10 CIT at 615, 646 F.Supp. at 257. Consequently, the issue as posed by plaintiff of whether its finished peanut butter is an "article of foreign origin" subject to country of origin marking, simply begs the more fundamental question presented to Customs in the remand—and thoroughly briefed by counsel—whether the Canadian-origin slurry would be "substantially transformed" under the *Gibson–Thomsen* test by plaintiff's U.S. processing so that CPC would be the "ultimate purchaser" of the slurry within the purview of the statute. Implicit in Customs' Remand Ruling is that since no substantial transformation of the Canadian-origin slurry results from plaintiff's U.S. processing, the retail consumer rather than CPC would be the ultimate purchaser of the import under the statute. Irrespective of whether the issue in this case is couched in terms of whether the finished peanut butter product assertedly excepted from country of origin marking is an "article of foreign origin" within the purview of § 1304(a), whether plaintiff's United States processing results in "substantial transformation" of the Canadian-origin slurry under the traditional *Gibson–Thomsen* criteria, or whether plaintiff or the retail consumer of its finished peanut butter is the "ultimate purchaser" of the slurry under the marking statute, the result remains the same: CPC's retail containers of finished peanut butter must bear an appropriate country of origin marking. In the analogous situation in *National Juice,* the court similarly ruled, with reference to substantial transformation, ultimate purchaser, and the marking statute:

> The court concludes that Customs' ruling that manufacturing juice concentrate is not substantially transformed when it is processed into retail orange juice products is not arbitrary or capricious, but is in accordance with applicable law. [Footnote

omitted.] The orange juice processors are not the ultimate purchasers of the imported product because consumers are the last purchasers to receive the product in essentially the form in which it was imported. In accordance with 19 U.S.C. § 1304, the retail packaging must bear an appropriate country of origin marking.

## V.

### CONCLUSION

Notwithstanding the U.S. processing of the Canadian-origin slurry described in the record, CPC would not be the "ultimate purchaser" within the contemplation of 19 U.S.C. § 1304(a) because consumers would be the last purchasers to receive the product in essentially the form imported.[12] *National Juice*, while involving the issue of substantial transformation of foreign orange juice concentrate processed into retail orange juice products rather than, as here, the issue of substantial transformation of foreign peanut slurry processed into finished peanut butter, is compellingly analogous. Customs, too, found *National Juice* analogous and under that authority reasonably and properly applied the "essential character" analysis to plaintiff's proposed U.S. processing of Canadian-origin peanut slurry. Accordingly, the court affirms the Remand Ruling and rejects plaintiff's challenge to the Remand Ruling as arbitrary, capricious, or otherwise contrary to law. A declaratory judgment in favor of defendant will be entered to that effect

### JUDGMENT

This case having been duly submitted for decision and this court after due deliberation, having rendered a decision herein, now, in conformity with said decision, it is hereby **ORDERED, ADJUDGED, AND DE-CREED:**

Customs Headquarters Ruling 559965, dated January 24, 1997, issued on remand of Customs Headquarters Ruling Letter

557994, dated October 24, 1994 pursuant to *CPC International, Inc. v. United States,* 933 F.Supp. 1093 (CIT July 8, 1996), *rehearing denied,* 956 F.Supp. 1014 (CIT January 6, 1997) is declared to be not arbitrary, not capricious, not otherwise contrary to law, and is hereby sustained; and it is further **ORDERED, ADJUDGED AND DECREED that:**

Judgment be entered for defendant.

---

12. The court's decision to sustain Customs' ruling that notwithstanding CPC's processing to enhance the taste, smoothness and shelf life of the product, and such processing would not result in a "substantial transformation" of the Canadian-origin slurry because the essential character of CPC's Skippy brand peanut butter is imparted by peanut slurry (both imported and domestic-origin), carries no negative connotation whatever regarding either CPC's United States processing or of the quality of the resulting finished peanut butter.